# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

WILLIAM A. BARRON, JR.,
and RUSSELL NELSON,

Plaintiffs,

v.

MICHAEL W. LAMPLEY, et al.,

Defendants.

CIVIL ACTION NO.

4:15-CV-0038-HLM

## ORDER

This case is before the Court on Defendant Leatherman's Motion to Dismiss First Amended Complaint and, in the Alternative, Motion for More Definite Statement [118], Defendant Justman's Motion to Dismiss for Failure to State a Claim [121], Defendants DJE, LLC, LJFG, LLC, and Tunica Music Group, LLC's Motion to Dismiss First Amended

Complaint [125], and Plaintiffs' Second Motion to Produce Unredacted Records of Defendant Leatherman's IOLTA Account [146].

## I.   Background

### A.   Procedural Background

The Court incorporates the procedural background portions of its previous Orders as if set forth fully herein and adds only those facts relevant to the instant Motions. On June 22, 2015, the Court entered an Order dismissing some of Plaintiffs' claims with prejudice and ordering Plaintiffs to file an Amended Complaint as to Plaintiffs' remaining claims. (First Order of June 22, 2015 (Docket Entry No. 77).) On July 31, 2015, Plaintiffs filed their Amended Complaint. (Docket Entry No. 96.) The Amended Complaint is over 800 pages long, contains 97 counts, and has 187 exhibits. (Id.) On September 8, 2015, Defendant Leatherman filed his

2

Motion to Dismiss First Amended Complaint and, in the Alternative, Motion for More Definite Statement ("Leatherman Motion to Dismiss"). (Docket Entry No. 118.) On September 8, 2015, Defendant Justman filed his Motion to Dismiss for Failure to State a Claim ("Justman Motion to Dismiss"). (Docket Entry No. 121.) On September 15, 2015, Defendants DJE, LLC ("DJE"), LFJG, LLC ("LFJG"), and Tunica Music Group, LLC ("TMG") (collectively "Leatherman Entities") filed their Motion to Dismiss First Amended Complaint, or in the Alternative, for More Definite Statement ("Entities Motion to Dismiss"). (Docket Entry No. 125.) On November 24, 2015, Plaintiffs filed their Second Motion to Produce Unredacted Records of Defendant Leatherman's IOLTA Account ("Second Motion to Produce"). (Docket Entry No. 146.) The briefing processes for those Motions are complete, and the Court finds the matters ripe for resolution.

3

## B.    Factual Background

The underlying factual allegations in this case remain largely unchanged from Plaintiffs' original Complaint.[1]  The Court incorporates the background portion of its First Order of June 22, 2015 as if set forth fully herein.  (First June 22, 2015 Order (Docket Entry No. 77) at 2-36.)   The Court references additional facts as set forth in the Amended Complaint as needed to address the relevant legal issues.

## II.    Standard Generally Governing a Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) allows the Court to dismiss a complaint, or portions of a complaint, for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).    When reviewing a motion to

---

[1]   The Parties all reached the same conclusion.  (See e.g., Pl.'s Resp. Leatherman Mot. Dismiss (Docket Entry No. 133) at 2; Br. Supp. Leatherman Mot. Dismiss (Docket Entry No. 120) at 2; Br. Supp. Justman Mot. Dismiss (Docket Entry No. 121-1) at 3; Br. Supp. Entities Mot. Dismiss (Docket Entry No. 125-1) at 2.)

dismiss, the Court must take the allegations of the complaint as true and must construe those allegations in the light most favorable to the plaintiff. <u>Alvarez v. Attorney Gen. for Fla.</u>, 679 F.3d 1257, 1261 (11th Cir. 2012).

Although a court is required to accept well-pleaded facts as true when evaluating a motion to dismiss, it is not required to accept the plaintiff's legal conclusions. <u>Chandler v. Sec'y of Fla. Dep't of Transp.</u>, 695 F.3d 1194, 1199 (11th Cir. 2012) (citing <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)). The Court also does not accept as true "unwarranted deductions of fact or legal conclusions masquerading as facts." <u>Snow v. DirecTV, Inc.</u>, 450 F.3d 1314, 1320 (11th Cir. 2006) (internal quotation marks and citation omitted).

Finally, the Court may dismiss a complaint if it does not plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Simpson v.</u>

Sanderson Farms, Inc., 744 F. 3d 702, 708 (11th Cir. 2014) (internal quotation marks omitted) (quoting Iqbal, 556 U.S. at 678). In Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the Supreme Court observed that a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555. Although factual allegations in a complaint need not be detailed, those allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. Moreover, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. The mere possibility that the defendant might have acted unlawfully is not sufficient to allow a claim to survive a motion to dismiss.

6

Id. Instead, the well-pleaded allegations of the complaint must move the claim "across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

## III. Discussion

### A. § 12(a)(2) Claims

Counts 1, 13, and 25 of Plaintiffs' Amended Complaint are claims for sale of a security via material misrepresentations in a prospectus in violation of 15 U.S.C. § 77l(a)(2) for the DJE Investment Scheme, the LJFG Investment Scheme, and the TMG Investment Scheme respectively. (Amd. Compl. (Docket Entry No. 96) ¶¶ 596-616, 739-759, 884-904.) Counts 2, 14, and 26 allege that Defendants Lampley, Leatherman, Justman, GSG, and various entities related to the relevant scheme acted as control persons and are thus liable for the violations alleged

7

in either Count 1, 13, or 25 depending on the scheme.  (Id. ¶¶ 617-624, 760-767, 905-912.)

### 1.   Pleading Standard

§ 12(a)(2) claims are generally non-fraud claims.  See Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1277 (11th Cir. 2006) ("Likewise, § 12(a)(2) extends similar liability to misrepresentations in prospectuses and oral communications.  It is clear that neither allegations of fraud nor scienter are necessarily part of either of these claims.  For this reason, we refer to these two claims as 'nonfraud' claims."  (citation omitted)).  When the underlying misrepresentation for a § 12(a)(2) claim "is also alleged to support a claim for fraud under the Exchange Act and Rule 10(b)," the Court applies Federal Rule of Civil Procedure 9(b).  Id.  Here, Plaintiffs' First Amended Complaint alleges that the misrepresentations in the nonfraud claims also are

8

part of the fraud claims. The Court therefore applies the Rule 9(b) pleading standard.

Under Rule 9(b), a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To plead a fraud claim with particularity, "a plaintiff must plead facts as to time, place, substance of the defendant[']s alleged fraud, specifically the details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them." Jenkins v. BAC Loan Servicing, LP, 822 F. Supp. 2d 1369, 1380 (M.D. Ga. Sept. 29, 2011) (internal quotation marks and citation omitted). "This means that to state an actionable claim for fraud, the plaintiff must state the who, what, when[,] where, and how." Id. (alteration in original) (internal quotation marks and citation omitted).

9

"Generally, to survive a Rule 9(b) motion, a plaintiff claiming fraud must apprise each defendant of the scope of his or her participation in the alleged fraud." Ackerman v. Nat'l Prop. Analysts, Inc., 887 F. Supp. 494, 505 (S.D.N.Y. Sept. 9, 1992). A "blanket allegation that 'defendants made representations' without any further specificity is fatal to [a fraud] claim." Fox Fuel, a Div. of Keroscene, Inc. v. Delaware Cnty. Sch. Joint Purchasing Bd., 856 F. Supp. 945, 954 (E.D. Pa. June 8, 1994). "In a case with multiple defendants, the complaint should contain specific allegations with respect to each defendant; generalized allegations lumping multiple defendants together are insufficient." W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc., 287 F. App'x 81, 86 (11th Cir. 2008) (internal quotation marks omitted).

10

In their earnest attempt to amend the Complaint to comply with the Court's previous Order, Plaintiffs seem to have forgotten the purpose of the pleading requirements of the Federal Rules of Civil Procedure.

> The purpose of these rules is self-evident, to require the pleader to present his claims discretely and succinctly, so that, his adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not.

Weiland v. Palm Beach Cty. Sheriff's Office, 792 F.3d 1313, 1320 (11th Cir. 2015) (quoting T.D.S. Inc. v. Shelby Mut. Ins. Co., 760 F.2d 1520, 1544 n.14 (11th Cir.1985) (Tjoflat, J., dissenting)). Sorting through a plaintiff's complaint should not leave the Court and other parties feeling groggy or punch-drunk but with a clear understanding of the plaintiff's claims. Instead of focusing on those purposes, Plaintiffs'

11

Amended Complaint is an overly-complicated 845 page document, containing 97 different counts, pulling no punches, and repeatedly repetitive[2] recitation of Plaintiff's factual allegations and implications and is anything but "a short and plain statement of the claim" or the facts. Fed. R. Civ. P. 8(a)(2). The Court would be justified dismissing Plaintiffs' Amended Complaint on this basis alone. See Muhammad v. Bethel-Muhammad, No. CIV.A. 11-0690-WS-B, 2012 WL 206173, at *1-2 (S.D. Ala. Jan. 24, 2012) (requiring the plaintiff to replead a complaint in which "[m]any of the complaint's paragraphs are long and rambling, and most contain superfluous commentary rendering it difficult if not impossible to discern whether the plaintiff has alleged the elements of a cause of action," and where "the plaintiff has pointlessly multiplied the number of counts by alleging each

---

[2] Irony intended.

count against only one defendant even when more than one defendant is accused of the same wrongdoing."). While Plaintiffs have provided significantly greater factual details and somewhat resolved their earlier issues with group pleading, they have failed to address several deficiencies the Court described in its previous Order.

The Court's previous Order on the Motions to Dismiss stated: "Plaintiffs' allegations in Count I fail to meet the pleading requirements of Rule 9(b). Plaintiffs' § 12(a)(2) allegations are conclusory and are merely recitations of the elements of a § 12(a)(2) claim." (First June 22, 2015 Order at 67.) Counts 1, 13, and 25 of the Amended Complaint do little to resolve the first Complaint's deficiencies in this regard. Instead, those Counts are replete with mere legal

13

conclusions and recitations of the elements of a § 12(a)(2) claim.[3]

Plaintiffs' Amended Complaint also resembles a shotgun pleading. The paragraphs incorporated into Counts 1, 13, and 25, while often containing relevant facts, also contain facts that do not support an element of the claim, including some that occurred after the alleged investments. Incorporating those hundreds of paragraphs of those facts into the count does not fulfill the requirements of Rules 8 and 9.[4] "The unifying characteristic of all types of shotgun

---

[3] The Court emphasizes that it does not mean to suggest that Plaintiffs need to once again copy and paste every single factual allegation and inference that they have repeated elsewhere in the Amended Complaint into each count of the Complaint. Plaintiffs do, however, need to provide notice to Defendants of which facts support which Counts.

[4] The Court again cautions and clarifies that the overriding, but not only, deficiency with Plaintiffs' Amended Complaint is not a lack of detailed factual allegations but a lack of clarity about which facts support the elements of the claims.

14

pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." Weiland, 792 F.3d at 1323.[5] While each count of the Amended Complaint does not reincorporate all of the proceeding paragraphs, the paragraphs incorporated into those counts also incorporate most of the other factual allegations of the Amended Complaint. For instance, Count 25 incorporates paragraphs 2-87, 457-530, and 570-595. (Am. Compl. ¶ 884.) Paragraph 514 states that Plaintiffs'

---

[5] Plaintiffs misread Weiland to say that the term "shotgun pleading" "only applies" in four specific situations. (Resp. Entities Mot. Dismiss (Docket Entry No. 136) at 2.) Instead, the Eleventh Circuit specifically stated that it had "identified four rough types or categories of shotgun pleadings" and that "the groupings cannot be too finely drawn." Weiland, 792 F.3d at 1322. The Eleventh Circuit's categories are not an exhaustive list and merely because the Amended Complaint may not fall squarely within one of those descriptions does not mean that it is not a shotgun pleading or does not deserve to be dismissed.

15

believe that the TMG scheme paid false returns on investors "is based on the facts, pleaded throughout this Complaint, that the DJE and LJFG investment schemes were both fraudulent," thereby causing Count 25 to incorporate and rely on all the other factual allegations of the Amended Complaint.

Moreover, in some instances Plaintiffs have failed to resolve the issues with group pleading identified in the Court's previous Order on the Motions to Dismiss. Under Rule 9(b) Plaintiffs must make specific allegations with respect to each Defendant and cannot lump together all the Defendants. While Plaintiffs have stopped their blanket use of Defendants for all allegations, in some instances Plaintiffs have merely replaced the word "Defendants" with a list of

Defendants who may have acted.  (See e.g., Am. Compl. ¶¶

162, 202.)  Such allegations do not comply with Rule 9(b).[6]

Because Counts 1, 13, and 25 contain only legal

conclusions and a recitation of the elements of a § 12(a)(2)

claim, the Court finds that Plaintiffs have failed to state a

claim for relief as to those counts and dismisses them with

prejudice.[7]   Because Plaintiffs have already had an

_____

[6] The group pleading doctrine does not apply to these allegations.   Group pleading applies to group-published information and only to the officers and directors of a corporation or corporate insiders who could reasonably be held accountable for the corporation's public statements.  In re AFC Enterprises, Inc. Sec. Litig., 348 F. Supp. 2d 1363, 1371 (N.D. Ga. Dec. 8, 2004) and In re JDN Realty Corp. Sec. Litig., 182 F. Supp. 2d 1230, 1250-51 (N.D. Ga. Jan. 25, 2002); In re Premiere Technologies Inc., No. 1:98-CV-1804-JOF, 2000 WL 33231639, at *10 (N.D. Ga. Dec. 8, 2000).  Despite Plaintiffs' voluminous factual evidence, they have not shown that Defendants Lampley, Leatherman, and Justman were corporate insiders of the same corporation.

[7] The Court also dismisses Counts 2, 14, and 26 because they fail to meet the pleading standards outlined above and because they are derivative of Counts 1, 13, and 25.  See In re World Access, Inc., 310 F. Supp. 2d 1281, 1300 (N.D. Ga. Mar. 16,

17

opportunity to replead their Complaint, have ignored the Court's previous Order discussing the flaws of the Complaint, and the Court has already spent substantial amounts of time addressing Plaintiffs' claims dismissal with prejudice is appropriate.  See Luft v. Citigroup Glob. Markets Realty Corp., No. 14-11936, 2015 WL 4079434, at *2 (11th Cir. July 7, 2015) ("When faced with a shotgun pleading, a district court must order a litigant to replead for a more definite statement of the claim.  When the amended complaint still fails to cure the deficiency, the complaint may be subject to dismissal." (citation omitted)); Harrison v. Bd. of Regents of

2004) ("Plaintiff Tanner's section 20(a) and section 15 claims are dependent upon a finding that there is a triable issue of fact as to whether a primary violation of securities law has occurred. Because there is not, these claims accordingly fail."); In re JDN Realty Corp. Sec. Litig., 182 F. Supp. 2d 1230, 1241 (N.D. Ga. Jan. 25, 2002) ("[A] plaintiff cannot adequately plead controlling person liability if he does not adequately plead the primary violation.").

18

Univ. Sys. of Georgia, 519 F. App'x 641, 643 (11th Cir. 2013) ("'Dismissal ... is appropriate where there is a clear record of willful contempt,'" and where "[t]he district court had already devoted substantial time to the consideration of Harrison's previous complaints." (first alteration in original) (internal quotation marks omitted) (quoting Gratton v. Great Am. Commc'ns, 178 F.3d 1373, 1374 (11th Cir.1999)).[8]

### 2.  Statute of Limitations

The statutes of limitations and repose for 15 U.S.C. § 77l(a)(2)--or § 12(a)(2) of the Securities Act of 1933--are "one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence," but no such action can be brought "more than three years after the sale." 15 U.S.C.

---

[8] The same reasoning applies to other Counts the Court dismisses, infra, and the Court dismisses those Counts with prejudice.

19

§ 77m.   "This statute of limitations applies an objective 'inquiry notice' analysis."   Gerin v. Aegon USA, Inc., 242 F. App'x 631, 632 (11th Cir. 2007).[9]   "'Inquiry notice is the term

---

[9] The cases cited by Plaintiffs, rejecting a notice inquiry standard, interpret the statute of limitations, set forth in 28 U.S.C. § 1658(b), for violations of § 10(b) of the Securities Exchange Act of 1934.   Merck & Co. v. Reynolds, 559 U.S. 633, 635 (2010).   Courts across the country are split on whether the Supreme Court's ruling in Merck applies to claims under the Securities Act.   See e.g., In re Magnum Hunter Res. Corp. Sec. Litig., No. 14-2581-CV, 2015 WL 3852561, at *3 (2d Cir. June 23, 2015) ("We have never considered whether Merck abrogates this circuit's existing 'inquiry notice' rule in favor of the discovery rule in Securities Act claims, an issue that divides the district courts in this circuit.").   The Eleventh Circuit has not addressed the issue.   Because Merck is not directly applicable to this case, the Court follows the Eleventh Circuit's holdings.   The only district court in this Circuit to address the issue also concluded that inquiry notice still applies.   Sewell v. D'Alessandro & Woodyard, Inc., 725 F. Supp. 2d 1344, 1346 (M.D. Fla. July 20, 2010) ("Thus, the defendants' state of mind is not one of the 'facts' a reasonably diligent plaintiff would need to discover to start the limitations clock. Rather, the 12(a)(2) clock starts ticking when a reasonably diligent plaintiff would have discovered facts which reveal an untrue statement or omission.").

20

used for knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed.'" Id. (quoting Theoharous v. Fong, 256 F.3d 1219, 1228 (11th Cir.2001)).

Before February 25, 2015, Plaintiffs became aware that several of the alleged misrepresentations made by various Defendants were untrue. The discovery of an untrue statement or omission triggers the running of the statute of limitations. Alternatively, even if no single one of these revelations may have given Plaintiffs actual or constructive notice of a possible legal claim, the sum of those facts gave Plaintiffs at least inquiry notice. While not going blow-by-blow through all of the misrepresentations discovered by Plaintiffs before February 24, 2015, many, but not necessarily all, of the alleged misrepresentations include the following.

21

Plaintiffs allege that Defendant Justman misrepresented to them, in a February 7, 2011 email, that he had "reliable judgment with respect to the assessment of future fight events for their expected profitability" and that his assertion was false because he only had four months experience investing in fighting events. (Am. Compl. ¶¶ 108, 137.) Plaintiffs knew of Defendant Justman's lack of experience because he was their brother-in-law and told them, in a January 3, 2011 email, that he and Defendant Leatherman had only been investing in fighting events since the previous November of 2010 and were only getting their feet wet. (Am. Compl. Ex. 5 (Docket Entry No. 96-1).) Plaintiffs claim that Defendant Justman misrepresented to them that investors would receive a share of both ticket and pay-per-view revenue from a June 2011 Strikeforce but that no pay-per-view funds were ever demonstrated, calculated or paid to

22

investors." (Am. Compl. ¶¶ 131, 137.) Plaintiffs would have known that they did not receive the money, and thus that Defendant Justman's representation was false, before February 25, 2014. With regard to a September 19, 2011 email from Defendant Justman (Am. Compl. Ex. 23 (Docket Entry No. 96-2)), Plaintiffs contend that "the fact that the math did not work out means that money had to have been taken from some other source" (Am. Compl. ¶ 157). It is clear from the email itself that the math does not work out, and thus, if Plaintiffs' allegations are true, Plaintiffs should have been on notice that the funds came from somewhere else. All of these facts occurred before Plaintiffs' October 30, 2012 investments with Defendant DJE.

It also appears that Plaintiffs had concerns with the DJE investments and encountered difficulties after October 30, 2012.

23

In April 2012, Plaintiff Barron received an unsigned "Fighters Participation Agreement" purporting to be an agreement between Defendant GSG and Defendant LJFG. (Am. Compl. ¶ 329.) Plaintiffs claim that the Fighters Participation Agreement (Am. Compl. Ex. 97 (Docket Entry No. 96-5)) contained a number of misrepresentations, including that the deal between Defendant GSG and Defendant LJFG would be mutually exclusive, which was false or misleading because Plaintiffs had otherwise been told that Defendant LJFG's investment represented only half of the total investment sought by Defendant GSG (Am. Compl. ¶ 334). A March 22, 2012 email from Defendant Justman made it clear that Plaintiffs were only contributing to half of the total 1.6 million dollar investment and that the other half was already covered. (Am. Compl. Ex. 88 (Docket Entry No. 96-5).) Plaintiffs therefore should have known, on

24

the day they received the Fighters Participation Agreement in 2012, that the representation that the agreement was mutually exclusive was false.

On April 30, 2012, Defendant Leatherman gave Plaintiff Barron an "Agreement for Fighter Participation," which Plaintiff Barron signed. (Am. Compl. ¶ 335; Am. Compl. Ex. 94 (Docket Entry No. 5).) Plaintiffs allege that the Agreement for Fighter Participation misrepresented "[t]hat proceeds earned from the LJFG investment scheme would be paid to investors on a per-unit, pro rata basis" because in reality "no more than twenty-nine and one-half of said units were ever actually sold at any one time" and "the purported proceeds of the LJFG investment were distributed as though the entire thirty-two units had been sold" while Defendant Leatherman kept the remaining funds in his IOLTA account. (Am. Compl. ¶ 336.) Plaintiffs, however, knew of this

25

arrangement, no later than December 11, 2012, when Plaintiff Barron purchased four additional units and received the payouts owed to those units for previous fights. (Am. Compl. Ex. 98 (Docket Entry No. 96-5).) In addition, the Modified Agreement for Fighter Participation, signed by Plaintiff Barron and dated December 11, 2012, indicates that Plaintiff Barron will receive a given percentage of the "Participants Fund Pool" based on the number of units he purchased and such percentage is not dependent on the total number of units sold by Defendant LJFG. (Am. Compl. Ex 95.) During Plaintiffs' involvement with Defendant LJFG, Defendant Leatherman would create and send reports to Plaintiffs showing a breakdown of the funds received by Defendant GSG and the distribution of payments. (Am. Compl. ¶ 423.) Plaintiffs insist that these documents "falsely represent[] that all 32 shares of the LJFG investment were

26

sold and being paid equally" and "conceal the fact that a portion of the purported returns were not being distributed, but rather, were being retained by [Defendant] Leatherman." (Id.)   In fact, the calculations in these documents clearly show that all 32 shares were not sold and were not being paid out.  (Am. Compl. Ex. 103 (Docket Entry No. 96-5).)  By totaling the amounts paid out and dividing by the amount allocated to each unit, it is clear that less than 30 units were sold.  (Id.)  Not only are these reports not misleading, they in fact reveal the supposed falsity that all 32 shares were sold as early as September 24, 2012 and as late as November 27, 2013.  Finally, a December 5, 2012 email from Defendant Justman to Plaintiff Barron and Defendant Leatherman explicitly states that eight units of the LJFG fighter group were still unsold and that "money is stacking up in an escrow account for the unsold shares."   (Am. Compl. Ex. 100

27

(Docket Entry No. 96-5).)  This email makes perfectly clear that Plaintiffs discovered the alleged misrepresentation in the Agreement for Fighter Participation well before February 25, 2014--one year before Plaintiffs filed this lawsuit.

In April 2012, Defendant Lampley provided Plaintiff Barron with promotion materials for the LJFG investment. (Am. Compl. ¶ 310; Am. Compl. Ex. 35 (Docket Entry No. 96-3).)  Plaintiffs repeatedly contend that the projected returns contained within those promotional materials were misleading because based on the formula for calculating distribution of funds, the fighters in whom Plaintiffs were purportedly investing would have had to earn nearly impossibly large earnings to create the returns suggested in the promotional materials.  (See e.g., Am. Compl. ¶¶ 310(f), 314-326, 347.)  Plaintiffs specifically state that the projected returns were false representations "given the purported

28

returns distribution structure." (Am. Compl. ¶¶ 310(f), 347.) Plaintiffs, however, were aware of this alleged misrepresentation, on which they claim to have relied, well before February 25, 2014, causing the statute of limitations to have run. The promotional material itself contained the basic outline of the payout formula. (Am. Compl. Ex. 35.) A December 16, 2012 email from Defendant Justman to Plaintiffs contained the payout formula, including the existence of a 10% management fee. (Am. Compl. Ex. 43 (Docket Entry No. 96-3).) Both the Agreement for Fighter Participation and Modified Agreement for Fighter Participation, signed by Plaintiff Barron in 2012, indicate the percentage of proceeds received by Defendant LJFG that Plaintiff Barron was to receive for each unit. (Am. Compl. Exs. 94-95.) Moreover, the purported agreement between Defendant GSG and Defendant LJFG states the percentage

29

of earnings Defendant GSG would pay to Defendant LJFG. (Am. Compl. Ex. 95.) Finally, the reports generated by Defendant Leatherman, and provided to Plaintiffs, would have further clarified the calculation of payouts to Plaintiffs. Based on those facts, Plaintiffs had notice as to the payout formulas and were thus readily able to compare their actual returns with the projected returns or to perform the calculations now done in the Amended Complaint to determine that the projected returns were unrealistic. Based on those facts, Plaintiffs, through the exercise of ordinary intelligence, should have discovered the alleged untrue statement about projected returns in the promotional materials more than one year before they climbed into the ring to square off with Defendants by filing this lawsuit.

Plaintiffs faced off with several other issues with their investments. On June 4, 2012, Defendant Justman

30

acknowledged in an email that Plaintiffs had "concern[s] with the lack of timely info" and the failure of Defendant Lampley to provide reports. (Am. Compl. Ex. 49 (Docket Entry No. 96-4).) On July 11, 2013, another email from Defendant Justman indicated that the Plaintiffs felt a need to ask for more details about the fights and the LJFG settlement sheets. (Am. Compl. Ex. 50 (Docket Entry No. 96-4).) By December 2013, Plaintiff Barron felt that it was necessary to insist on a year-end audit of both Defendant LJFG and Defendant TMG as well as the Delta Country Jam. (Am. Compl. Ex. 52 (Docket Entry No. 96-4).)

With respect to the investments through Defendant TMG, Plaintiffs allege a number of other misrepresentations that they either did, or should have, discovered prior to February 25, 2014. Plaintiffs claim that they were misled to believe that all investors, including Plaintiffs, would be paid

31

back on a pro rata basis and that Plaintiffs relied on that belief when investing. (Am. Compl. ¶ 513.) An email from Defendant Justman to Plaintiffs on August 12, 2013, however, states that because an investor pulled out the organizers were now seeking an investment collateralized with certain contracts and cash from the Festival. (Am. Compl. Ex. 152 (Docket Entry No. 96-6).) Plaintiffs' counter to this attack is unavailing. Defendant Justman's email may have not given Plaintiffs actual notice that these priority repayments existed but it certainly gave notice that such an opportunity was being sought, which would have allowed Plaintiffs to discover the earlier alleged misrepresentation and put them on inquiry notice as to a possible claim. On June 10, 2013, Plaintiff Nelson entered into the "Funding Agreement No. Tunica Music Festival." (Am. Compl. ¶ 495.)

32

After the Festival, but before February 25, 2014, it was clear to Plaintiffs that the Festival had performed poorly financially and that other problems existed. An October 31, 2013 email from Defendant Justman to Plaintiffs shows that the Festival lost money. (Am. Compl. Ex. 144 (Docket Entry No. 96-6).) That same email also shows that there were problems with the bookkeeping, as Defendant Justman admits that it was "impossible to reconcile [Defendant Lampley]'s expense numbers" in part because there had been "too many people and entities sending/wiring money to too many places with no central control or single DCJ bank account." (Id.) At this point Plaintiff Nelson should have known that he was unlikely to recoup one hundred percent of his investment, which Plaintiffs contend he was promised. (See Am. Compl. ¶ 495.) A January 25, 2015 email from Defendant Justman, also shows that Plaintiffs would not

33

receive back their investments from funds from the 2013 Festival but that Defendant Justman intended to try to make Plaintiffs whole at some point in the future. (Am. Compl. Ex. 54 (Docket Entry No. 96-4).) Furthermore, Defendant Justman, in a December 10, 2013 email, indicated that there were "a lot of issues" with the Delta Country Jam, that they may discover "other problems or irregularities," and that there will likely "be multiple lawsuits flying around in all directions." (Am. Compl. Ex. 52.) Based on these facts, Plaintiffs should have, and did, discover more than one year before this lawsuit was filed that some of the alleged misrepresentations made with regard to the Festival were false and that Plaintiffs possibly had a claim against some Defendants for the money owed to them.

While any one of the facts discussed herein could have triggered the running of the statute of limitations, the facts,

taken as a whole, clearly show that Plaintiffs were on inquiry notice of possible claims well before February 25, 2014. Moreover, if Plaintiffs were on inquiry notice as to one of the alleged schemes, then they were on inquiry notice as to all the schemes as each purported scheme involved similar Defendants, similar investments, and were often discussed together in the same emails and conversations.[10] Additionally, once being on inquiry notice, Plaintiffs should

---

[10] Certain allegations in Plaintiffs' Amended Complaint support this conclusion. (Am. Compl. ¶¶ 527(j) ("At the time Plaintiffs invested in the TMG investment scheme, [Defendant] Justman also had knowledge of the false aspects of the DJE and LJFG investment schemes, as set forth throughout this Complaint, and is either thereby imputed with knowledge of the false aspects of the TMG investment, or else was on inquiry notice that any representations made by [Defendant] Lampley or [Defendant] Leatherman should have been subject to additional verification measures, which [Defendant] Justman either recklessly failed to take, or did actually take, and, thereby, obtained knowledge of those false aspects of [Defendant] Lampley's or [Defendant] Leatherman's handling and involvement in the TMG investment scheme."), 528(f) (coming to the same conclusion with respect to Defendant Leatherman).)

35

have discovered at least some of the alleged misrepresentations well before February 25, 2014, as Plaintiffs' Amended Complaint demonstrates that many of those misrepresentations were discovered by a mere single phone call, email, or web search.

Based on the foregoing reasoning, Defendants are saved by the bell rung by the statute of limitations as set forth in 15 U.S.C. § 77m. The Court therefore dismisses Counts 1, 2, 13, 14, 25, and 26.

### 3. Prospectus

Defendant Justman (Br. Supp. Justman Mot. Dismiss at 7-9), Defendant Leatherman (Br. Supp. Leatherman Mot. Dismiss at 10-12), and Defendants DJE, LJFG, and TMG (Br. Supp. Entities Mot. Dismiss at 12-13) all contend that Plaintiffs have failed to identify a prospectus as an element of their § 12(a)(2) claims. Defendants argue that the

36

communications between themselves and Plaintiffs were not publically disseminated documents.[11]

The Securities Act of 1933 generally defines the term "prospectus" to mean "any prospectus, notice, circular, advertisement, letter, or communication, written or by radio or television, which offers any security for sale or confirms the sale of any security." 15 U.S.C. § 77b(a)(10). According to the Supreme Court, "the term 'prospectus' refers to a document soliciting the public to acquire securities." Gustafson v. Alloyd Co., 513 U.S. 561, 574 (1995). The Supreme Court continued saying that, "[f]rom the terms

---

[11] Plaintiffs mischaracterize the argument made by Defendants. For instance, Plaintiffs state that "[Defendant] Justman's argument interprets this definition to require that an issuer actually complete sales to a broad public population," while arguing that Plaintiffs' position is that "the word 'soliciting' does not require completed sales." (Resp. Justman Mot. Dismiss at 11.) Defendant Justman's argument is not about the difference between solicitation and completing sales.

37

'prospectus, notice, circular, advertisement, [or] letter,' it is apparent that the list refers to documents of wide dissemination" and that the term "prospectus" does not include face-to-face or telephonic conversations. Id. at 575 (second alteration in original) (quoting 15 U.S.C. § 77b(a)(10)). "In sum, the word 'prospectus' is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder." Id. at 584. In addition, "[t]he Supreme Court has made clear that the only oral communications that count are those that 'relate to a prospectus.'" Thompson v. RelationServe Media, Inc., 610 F.3d 628, 677 n.69 (11th Cir. 2010) (quoting Gustafson, 513 U.S. at 567-68).

As an initial matter, it is almost impossible to know with any certainty which communications by Defendants Plaintiffs believe to constitute a prospectus. The relevant allegation in

38

the Counts of Plaintiffs' Amended Complaint simply states that "[Defendants] Lampley, Leatherman, Justman, DJE, and GSG did make written communications which offered the DJE security for sale, so as to fall within the definition of 'prospectus.'" (Am. Compl. ¶ 608; see also Am. Compl. ¶¶ 751, 896.) As such, it is unclear which of the numerous exhibits Plaintiffs believe satisfy this element of their claim. In other places, Plaintiffs seem to suggest that all communications and documents from the various Defendants constitute a single prospectus. (Am. Compl. ¶ 220 ("The emails and documents provided from [Defendants] Justman, Leatherman, and Lampley, to Plaintiffs with regard to the DJE investment scheme, between January 2011 and October 2012, collectively, constituted a prospectus."); see also Am. Compl. ¶¶ 387, 523.) This alone demonstrates that Counts 1, 13, and 25 fail to state a claim for relief.

39

In ¶ 523 of the Amended Complaint, discussing the Defendant TMG investments, and now in their Responses to the Motions to Dismiss, Plaintiffs list some of the documents they argue constitute a prospectus, but they fail to explain why any of those specific or types of exhibits fulfill the requirements of a prospectus. Many of the exhibits and communications cited by Plaintiffs are either emails or private oral conversations between some Defendants and Plaintiffs. (Am. Compl. ¶¶ 92, 114, 149-52, 211, 215, 240, 252, 370, 425, 499.) Other exhibits cited by Plaintiffs as being prospectuses are instead contracts between a Plaintiff and a Defendant or between a Defendant and another entity. (Am. Compl. ¶¶ 106, 123, 127, 165, 180, 184, 205, 207, 332, 499.)[12] Neither of these two categories of communications

[12] The Court notes that the paragraphs cited in Plaintiffs' Response to Defendant Justman's Motion to Dismiss are often

40

satisfy the requirements for a prospectus.   Private emails and conversations are not public solicitations.[13]   Neither are the private contracts to which Plaintiffs cite.   Gustafson,

---

redundant as the paragraphs in the Amended Complaint often cite to the same exhibit. (See e.g., Am. Compl. ¶¶ 184.)  Other paragraphs cited by Plaintiffs are entirely irrelevant. (See e.g., Am. Compl. ¶¶ 232 (discussing Plaintiffs' reliance on Defendants Justman, Leatherman, Lampley, DJE, and GSG's expertise and not discussing any specific documents or communications), 364 (same), 442 (referencing other paragraphs that themselves discuss the emails and communications), 443 (repeating 442), 479 (referring to numerous other paragraphs in the Amended Complaint but not mentioning any specific communications or documents).)

At this point, it seems appropriate to remind Plaintiffs that it is not the responsibility of the Court to ferret through the extensive record in this case for support of Plaintiffs' position. Estate of Moreland v. Dieter, 395 F.3d 747, 759 (7th Cir. 2005) (stating that court will not scour record to locate evidence supporting party's legal argument and that perfunctory or undeveloped arguments are waived); Chattooga Conservancy v. Jacobs, 373 F. Supp. 2d 1353, 1376 (N.D. Ga. June 16, 2005) (stating that it is not court's responsibility to ferret out information contained in a massive record).

[13] The Court notes that while in some instances Defendants asked Plaintiffs to help recruit other investors, such a request does not transform an email, sent only to Plaintiffs or a small number of people, into a "public solicitation."

41

specifically dealt with a private sale agreement for sale of a company by its shareholders, and the Supreme Court held that "[t]he contract of sale, and its recitations, were not held out to the public and were not a prospectus as the term is used in the 1933 Act." Gustafson, 513 U.S. at 584.

Moreover, the Amended Complaint contains numerous allegations showing that the investment opportunities offered by Defendant Lampley, Leatherman, and Justman were not open to the public; nor were they widely disseminated. Instead, the solicitation of buyers--namely Plaintiffs and a few others--was direct and targeted. Plaintiffs repeatedly alleged that Defendants, specifically Defendant Justman, targeted them and recruited them because of their familial ties. (See e.g., Am. Compl. ¶¶ 229, 227(a),(j), 453(a),(c),(j), 475(a), 526.) The other DJE investors also had close ties to one of the Defendants; namely, they were Defendant

42

Leatherman's brother-in-law, a friend of his, and a cousin. (Am. Compl. Ex. 65 (Docket Entry No. 96-4).) Plaintiffs also alleged that "[Defendant] Leatherman specifically directed [Defendant] Justman, prior to Plaintiffs' investment in the DJE investment scheme, to seek out wealthy family members as potential investors in the DJE investment scheme." (Am. Compl. ¶ 278(a).) Defendants Justman, Leatherman, and Lampley did not want to solicit the public to invest with them. In order for their alleged scheme to succeed, they targeted people with whom they had close relationships and who would trust them. They did not widely disseminate any document soliciting the public.

Based on the foregoing facts, Plaintiffs have failed to identify a prospectus as the basis for their § 12(a)(2) claims.

43

### 4.   Summary

For the foregoing reasons, the Court dismisses Counts 1, 13, and 25, as well as Counts 2, 14, and 26, which are dependent on the substantive violations.

### B.   Section 10(b) and Rule 10b-5 Claims

Plaintiffs' federal securities law claims, in the Amended Complaint, include claims for violations of Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. §240.10b-5, with respect to the DJE investments in Counts 3, 4, and 5 (Am. Compl. ¶¶ 625-666), with respect to the LJFG investments in Counts 15, 16, and 17 (Am. Compl. ¶¶ 768-809), and with respect to the TMG investments in Counts 27, 28, and 29 (Am. Compl. ¶¶ 927-954).   Plaintiffs also bring control person liability claims, based on those § 10(b) and Rule 10b-5, claims in Counts 6,

44

7, 18, 19, 30, and 31.  (Am. Compl. ¶¶ 667-684, 810-827, 955-972.)

"An action alleging securities fraud is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires a complaint 'to state with particularity the circumstances constituting fraud.'" Sapssov v. Health Mgmt. Associates, Inc., 608 F. App'x 855, 860 (11th Cir. 2015) (quoting Fed. R. Civ. P. 9(b)).[14] Plaintiffs, as private litigants, must ALSO comply with the Private Securities Litigation Reform Act ("PSLRA") when pleading their § 10(b) claim. Thompson v. RelationServe Media, Inc., 610 F.3d 628, 633 (11th Cir. 2010).  The PSLRA requires a private plaintiff to "'state with particularity facts giving rise to

---

[14] The Court elaborates on the Rule 9(b) pleading standard supra Part III.A.1.

a strong inference that the defendant acted with the required state of mind.'" Id. (quoting 15 U.S.C. § 78u-4(b)(2)).

Plaintiffs' §10(b) claims suffer from the same deficiencies as Plaintiffs' §12(a)(2) claims discussed supra Part III.A.1. Counts 3, 4, 5, 15, 16, 17, 27, 28, and 29 contain solely conclusory allegations and recitations of the elements of a claim. Boilerplate allegations, reciting the elements of a 10b-5 claim, while seen in many 10b-5 complaints, "is clearly insufficient on its own under Rule 9(b)." Fujisawa Pharm. Co. v. Kapoor, 814 F. Supp. 720, 726-27 (N.D. Ill. 1993). Each Count incorporates hundreds of paragraphs and dozens of exhibits. Plaintiffs state that the alleged material misrepresentations and omissions can be found in those paragraphs and exhibits, but Plaintiffs provide no specificity about which misrepresentations or omissions they argue support their claims. (See e.g., Am. Compl. ¶¶

46

641, 770, 915.) In fact, many of the facts and exhibits cited by Plaintiffs occurred after Plaintiffs' investments, meaning Plaintiffs could not have relied on those misrepresentations or omissions when investing. Boilerplate allegations alone cannot survive Rule 9(b); instead, they must be "augmented with ample references to specific dates, statements, documents and contents elsewhere." Fujisawa Pharm., 814 F. Supp. at 726-27. Plaintiffs' Amended Complaint fails to provide these supplementary references and therefore cannot survive Rule 9(b).

Plaintiffs' brief statements in each of these counts purporting to state the misrepresentations "[i]n particular" do not provide the requisite specificity. (See e.g., Am. Compl. ¶¶ 635 (stating as a particular misrepresentation that Defendant GSG did not have investments in the staging of the events) 778 (Defendant GSG did not actually have

47

investments with professional fightsers), 923 (Defendants' lack of experience to stage a music festival and the existence of priority repayments).) Instead, these statements merely provide a few words summarizing the entirety of Plaintiffs' factual allegations and legal conclusions from hundreds of paragraphs and dozens of exhibits. These summary statements do not sufficiently inform Defendants of the claims against them in a manner that allows Defendants to form an adequate defense.

Additionally, for each supposed investment scheme, Plaintiffs pleaded three separate counts of §10(b) claims with each of the three counts purporting to also be a claim for a different subsection of Rule 10b-5. As each of the counts for each investment scheme incorporate the exact same paragraphs and exhibits, it is impossible to tell whether Plaintiffs contend that different facts support different claims

48

or whether all the claims are exactly the same--and therefore redundant. Such confusion defeats the goals of Rules 8(a) and 9(b) and the PSLRA.

Based on the foregoing reasons, the Court dismisses Counts 3, 4, 5, 15, 16, 17, 27, 28, and 29 of the Amended Complaint for failure to state a claim under Rules 8(a), 9(b), and the PSLRA. In addition, the Court dismisses Counts 6, 7, 18, 19, 30, and 31, as those claims are derivative of the substantive claims. Thompson v. RelationServe Media, Inc., 610 F.3d 628, 635-36 (11th Cir. 2010) ("Because a primary violation of the securities law is an essential element of a § 20(a) derivative claim, a plaintiff who pleads a § 20(a) claim can withstand a motion to dismiss only if the primary violation is pleaded with legal sufficiency.")

49

## C.   Federal RICO Claims

Counts 37-40 of the Amended Complaint allege claims for violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a)-(d).   (Am. Compl. ¶¶ 1029-1117.)   Plaintiffs' four RICO Counts correspond to the four subsection of § 1962.   (Id.)  The last of those, Count 40, relying on § 1962(d) alleges a claim for conspiracy to violate § 1962(a), (b), or (c).   Plaintiffs state that these RICO claims are brought only to the extent that Plaintiffs' investments do not constitute the purchase or sale of securities.   (Am. Compl. ¶¶ 1031, 1062, 1085, 1108.) Plaintiffs allege the existence of separate conspiracies with respect to the DJE, LJFG, TMG, and Note investment schemes, as well as an overarching "Master Enterprise" encompassing the four investment schemes and including Defendants Lampley, Leatherman, Justman, GSG, SPG,

50

DJE, LJFG, and TMG.  (Am. Compl. ¶¶ 1032-1036, 1063-1067, 1086-1090, 1109-1113.)  According to Plaintiffs, the underlying acts constituting a pattern of racketeering activity included mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, and, in addition for the LJFG and TMG conspiracies, the inducement of a person to engage in interstate travel in the execution of a scheme or artifice to defraud that person under 18 U.S.C. § 2314. (See e.g., Am. Compl. ¶¶ 1038, 1043, 1048, 1053.)

### 1.   Pleading Standard

Civil RICO claims must be pled with the level of specificity set forth in Rule 9(b). Ambrosia Coal & Const. Co. v. Pages Morales, 482 F.3d 1309, 1316 (11th Cir. 2007).[15]

---

[15] Some Courts have held that Rule 9(b) only applies to RICO claims when the predicate act on which the RICO claim is based sounds rest on allegations of fraud. See e.g., Rolls-Royce Corp. v. Heros, Inc., 576 F. Supp. 2d 765, 778 n.6 (N.D. Tex. 2008)

"To satisfy the Rule 9(b) standard, RICO complaints must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiffs; and (4) what the Defendants gained by the alleged fraud." Id. at 1316-17. A complaint alleging a RICO claim does not meet the Rule 9(b) standard if it is "devoid of specific allegations with respect to each defendant," "the plaintiffs lumped together all of the defendants in their allegations of fraud," and the complaint failed to "inform each defendant of the nature of his alleged participation in the fraud." Id. at 1317 (discussing the Eleventh Circuit's dismissal of the complaint in Brooks v. Blue Cross and Blue Shield of Florida, Inc., 116

_____

(stating that in the Fifth Circuit Rule 9(b) only applies to RICO claims sounding in fraud). The difference is immaterial in this case, as Plaintiffs' RICO claims rely on allegations of fraud.

52

F.3d 1364 (11th Cir.1997)). The Court further discusses the Rule 9(b) standard supra Part III.A.1. and Part B.

Counts 37-40 of the Amended Complaint fail to satisfy the Rule 9(b) standard. While Plaintiffs' Amended Complaint provides substantially more detailed and voluminous factual allegations, the RICO allegations do not provide the required specificity. The RICO Counts are devoid of specific allegations with respect to each Defendant and lump together all of the Defendants in their allegations of fraud. The RICO Counts fail to give even the slightest indication of each Defendant's respective role in the various supposed fraudulent enterprises. Moreover, the claims of mail and wire fraud do not set forth specific communications or emails or pieces of mail. Instead, Plaintiffs merely incorporate hundreds of paragraphs of the Amended Complaint, without explanation and without stating which facts or exhibits

53

support their claim for mail or wire fraud.  In fact, Plaintiffs often cite the exact same set of hundreds of paragraphs to support both their mail fraud and wire fraud allegations.  (See e.g., Amd. Compl. ¶ 1038 (citing Amended Complaint paragraphs 2-279 and 548-595 as relating to mail fraud and the exact same paragraphs as relating to wire fraud).)[16]

Under these circumstances, the Court finds that Plaintiffs' RICO claims failed to meet the Rule (b) standard.

## 2.   The PSLRA and RICO

Defendants contend that the PSLRA bars Plaintiffs from pursuing RICO claims in addition to their federal securities law claims.  (Leatherman Mot. Dismiss at 20-23; Justman Mot. Dismiss at 15-17; Entities Mot. Dismiss at 13-15.) Plaintiffs counterpunch by arguing that they may plead RICO

---

[16] Count 37, itself, incorporates over five hundred paragraphs. (Am. Compl. ¶ 1029 (incorporating Paragrahs 2-595).)

54

claims in the alternative in the event that their investments with Defendants did not constitute securities. (See e.g., Resp. Leatherman Mot. Dismiss at 37-38.)[17]

18 U.S.C. § 1964(c) states "that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO]." 18 U.S.C. § 1964(c). Congress enacted § 1964(c) "not simply 'to eliminate securities fraud as a predicate offense in a civil RICO action,' but also to prevent a plaintiff from 'plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as

---

[17] Plaintiffs mischaracterize the Court's earlier Order as holding that Plaintiffs had the right to plead in the alternative under the PSLRA. (Resp. Leatherman Mot. Dismiss at 38.) Quite clearly, neither the Court's previous Order, nor the case cited by the Court, addressed the specific rule of 18 U.S.C. § 1964(c), which was not at issue. (First June 22, 2015 Order at 80-81.)

securities fraud.'"  Bald Eagle Area Sch. Dist. v. Keystone

Fin., Inc., 189 F.3d 321, 327 (3d Cir. 1999) (quoting H.R.

Conf. Rep. No. 104–369, at 47 (1995)).  Courts therefore

"have applied the RICO bar in § 1964(c) broadly, regardless

of whether the plaintiff explicitly relied upon securities fraud

as a predicate act or even had standing to pursue a

securities fraud claim."  Licht v. Watson, 567 F. App'x 689,

693 (11th Cir. 2014).  "A plaintiff cannot avoid the RICO bar

by pleading other specified offenses, such as mail or wire

fraud, as predicate acts in a civil RICO action if the conduct

giving rise to those predicate offenses amounts to securities

fraud."  Dusek v. JPMorgan Chase & Co., No. 2:14-CV-184-

FTM-29CM, 2015 WL 5521998, at *20 (M.D. Fla. Sept. 17,

2015).

When the plaintiff "alleges that the defendants also

engaged in wire fraud and mail fraud" and that "conduct was

56

in furtherance of the defendants' overarching scheme to commit securities fraud," it is proper to dismiss the RICO claims. Licht, 567 F. App'x at 693. Furthermore, if "Plaintiffs allege the same misrepresentations to establish both the securities fraud claim...and the scheme to defraud necessary to establish the predicate acts," the underlying "conduct is actionable as securities fraud" and "cannot be a basis for a RICO claim." Baron v. Chehab, No. 05-3240 2006 WL 156828, at *8 (C.D. Ill. Jan. 20, 2006). Courts do not parse the plaintiff's claims to identify the parts that might be separable from the securities fraud. Id. In addition, conduct, such as mail or wire fraud, taken to support the scheme for securities fraud "is conduct undertaken in connection with the purchase and sale of securities" and cannot support a RICO claim. Bald Eagle Area Sch. Dist., 189 F.3d at 330.

57

In this case, Plaintiffs have pleaded, with great detail, the existence of a securities fraud scheme. From the opening bell, Plaintiffs described the efforts of Defendants as an "investment scheme." (Am. Compl. ¶ 82.) Plaintiffs, repeatedly allege that they purchased securities. (See e.g., Am. Compl. ¶¶ 217-219.)[18] The overwhelming majority of the Amended Complaint insists that Defendants engaged in the fraudulent sale of securities to Plaintiffs. Plaintiffs have numerous exhibits supporting their allegations. This is not a situation where Plaintiffs have little access to the necessary information to support their claims. In addition, the factual allegations and exhibits that Plaintiffs say support their claims or mail and wire fraud are the same factual

---

[18] Plaintiffs did state, without explanation, that, in the alternative, the investments with Defendants were not securities. (See e.g., Am. Compl. ¶ 222.)

58

allegations and exhibits that Plaintiffs use to support their claims under federal securities laws.

None of the Motions to Dismiss presently before the Court argue that Plaintiffs' investments were not securities.[19] None of the Parties briefed the issue of whether Plaintiffs' investments constitute securities under federal law. In similar cases, other district courts have dismissed the plaintiff's RICO claims. See Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP, 612 F. Supp. 2d 267, 280 (S.D.N.Y. Mar. 23, 2009) (dismissing the RICO claims because "[t]here [was], however, no argument before the

[19] Defendant Leatherman previously argued that Plaintiffs failed to identify a "security." (Br. Supp. First Leatherman Mot. Dismiss (Docket Entry No. 21-1) at 7-8.) Defendant Leatherman cited no statute or case law and provided no definition of the term "security." (Id.) The Court noted that none of the Parties provided any useful briefing of the issue, and concluded, for the purposes of a motion to dismiss, that Plaintiffs had sufficiently alleged the existence of securities. (First Order of June 22, 2015 at 56-57.)

59

Court that the equity interests the [plaintiffs] acquired were not securities" and despite the plaintiffs stating "that they have pleaded a RICO claim only in event that the Court determines that the equity interests that the [plaintiffs] acquired…are not securities."). Plaintiffs have provided no contrary authority. A broad application of the PSLRA's RICO bar does not leave Plaintiffs without a remedy in the event their investments do not constitute securities. Plaintiffs still have a variety of fraud and breach of contract claims left at their disposal.

Alternatively, the Court determines that Plaintiffs' investments at issue in this case did constitute securities. See Payton v. Flynn, No. 06 C 465, 2006 WL 3087075, at *6-8 (N.D. Ill. Oct. 26, 2006) (granting a motion to dismiss after determining whether the transactions in the case involved a "security").

60

The definition of security under the Securities Act is quite broad and includes, among other things, notes, stocks, evidence of indebtedness, and certificates of interest or participation in any profit-sharing agreement. 15 U.S.C. § 77b(a)(1 ). The Securities Exchange Act contains a similarly broad list of possible types of securities. 15 U.S.C. § 78c(a)(10).    "The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' In defining the scope of the market that it wished to regulate, Congress painted with a broad brush.    Reves v. Ernst & Young, 494 U.S. 56, 60 (1990) (quoting United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 849 (1975).  "Congress' purpose in enacting the securities laws was to regulate *investments,* in whatever form they are made and by whatever name they are called." Id. at 61.  "Congress sought to define 'the term 'security' in

61

sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" Meason v. Bank of Miami, 652 F.2d 542, 548-49 (5th Cir. 1981) (quoting H.R.Rep.No.85, 73d Cong., 1st Sess., 11 (1933)).[20] The Eleventh Circuit has "recognized that the Supreme Court has rejected a literal application of the definitional sections of the Securities Acts." Id. at 550. The Amended Complaint suggests two types of investments made by Plaintiffs: one in which Plaintiffs provided money to various Defendants to fund either fight events, fighters themselves, or a music festival, and one in which Defendant Lampley and Defendant GSG executed a Promissory Note in

---

[20] The Eleventh Circuit has adopted as binding all precedent from the United States Court of Appeals for the Fifth Circuit issued before September 30, 1981. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

62

favor of Plaintiff Barron in exchange for funds from Defendant Barron. The Court addresses each type of investment in turn.

### a. The DJE, LJFG, and TMG Investments

In what Plaintiffs have described as three separate schemes, Plaintiffs sent money to Defendants DJE, LJFG, and TMG for use in funding various events and fighter groups pursuant to various agreements that Plaintiffs made with those Defendants and their individual representatives. The Court finds that those investments constituted securities in the form of investment contracts.

The term "investment contract" "came to mean a contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment.'" S.E.C. v. W.J. Howey Co., 328 U.S. 293, 298 (1946) (quoting State v. Gopher Tire & Rubber Co., 146

63

Minn. 52, 56, 177 N.W. 937, 938 (May 28, 1920). "In other words, an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." Id. at 298-99. The Eleventh Circuit "has divided the Howey test into the three elements: (1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others." Bamert v. Pulte Home Corp., 445 F. App'x 256, 262 (11th Cir. 2011) (quoting SEC v. Unique Fin. Concepts, Inc., 196 F.3d 1195, 1199 (11th Cir.1999)). "The touchastone (sic) is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of

64

others." <u>United Hous. Found., Inc. v. Forman</u>, 421 U.S. 837, 852 (1975).

The first element, an investment in money, is easily met in this case. Plaintiffs provided detailed facts and exhibits demonstrating how they invested money through each of the DJE, LJFG, and TMG schemes, whether the money was wired through one of those entities or sent directly to Defendants Lampley and GSG.

The second element, a common enterprise, "exists where the 'fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties.'" <u>Alunni v. Dev. Res. Grp., LLC</u>, 445 F. App'x 288, 295 (11th Cir. 2011) (quoting <u>Eberhardt v. Waters</u>, 901 F.2d 1578, 1580 (11th Cir.1990)). In this case, Defendants sought the investments, and Plaintiffs relied entirely upon them to make a return on their

investments. To the extent the investment opportunities were real investments, Plaintiffs' potential for success was interwoven with that of Defendants Leatherman and Justman who also contributed and relied solely on the efforts of Defendants to use the money to fund fights, fighter groups, and the music festival. The second element of an investment contract is clearly met by the facts laid out in the Amended Complaint.

"As to the expectation of profits solely from the efforts of others prong, '[the Eleventh Circuit has] held that 'solely' is not interpreted restrictively'" and "[i]nstead, [courts] 'look[ ] to the economic reality, focusing on the dependency of the investor on the entrepreneurial or managerial skills of a promoter or other party.'" Alunni, 445 F. App'x at 296 (third alteration in original) (quoting United States v. Wetherald, 636 F.3d 1315, 1325 (11th Cir.2011)). "By profits, the Court

has meant either capital appreciation resulting from the development of the initial investment, or a participation in earnings resulting from the use of investors' funds." United Hous. Found., Inc. v. Forman, 421 U.S. 837, 852 (1975) (citations omitted).  In cases where the investor seeks profits, "the investor is 'attracted solely by the prospects of a return' on his investment."  Id. (quoting Howey, 328 U.S. at 293). "By contrast, when a purchaser is motivated by a desire to use or consume the item purchased—'to occupy the land or to develop it themselves,' as the Howey Court put it—the securities laws do not apply."  Id. at 852-53 (quoting Howey, 328 U.S. at 300) (citation omitted).  This case squarely fits within this third element.   To the extent any investment opportunities were real, Plaintiffs were entirely dependent upon Defendants' skills and efforts to earn a return on their investments.  Plaintiffs were to receive profits in the form of

67

participating in the earnings resulting from the use of their funds which were to be used by Defendants to invest in fighter groups, fighting events, and a music festival. Finally, Plaintiffs invested solely by a desire to earn a return on their investments. They did not purchase any property or land, but instead participated in Defendants' investment schemes. The Court therefore concludes that the DJE, LJFG, and TMG schemes all involved the purchase, by Plaintiffs, of securities in the form of investment contracts. The PSLRA therefore knocks out Plaintiffs' RICO claims relating to those investment schemes.

### b.    The Note

The Court also concludes that the Note between Plaintiff Barron and Defendants Lampley and GSG fell within the statutory definition of "security," which includes "any note." The Supreme Court has adopted the "family resemblance

68

test" for determining whether a note is a security. Reves, 494 U.S. at 64-65. In addition, "because the Securities Acts define 'security' to include 'any note,' [the Court] begin[s] with a presumption that every note is a security." Id. "[T]hat presumption may be rebutted only by a showing that the note bears a strong resemblance (in terms of the four factors we have identified) to one of the enumerated categories of instrument. If an instrument is not sufficiently similar to an item on the list, the decision whether another category should be added is to be made by examining the same factors." Id. at 67. The enumerated categories are "the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a

69

note which simply formalizes an open-account debt incurred in the ordinary course of business," and "notes evidencing loans by commercial banks for current operations." Id. at 65 (quoting Exch. Nat. Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126, 1138 (2d Cir. 1976) modified sub nom. Chem. Bank v. Arthur Andersen & Co., 726 F.2d 930 (2d Cir. 1984) and Chem. Bank, 726 F.2d at 938). "[T]he factors to consider when determining if an instrument is a 'note' are whether 'the buyer is interested primarily in the profit the note is expected to generate[,]...it is an instrument in which there is common trading for speculation or investment,' the investing public reasonably expects the instrument to be a note, and no other 'regulatory scheme significantly reduces the risk of the instrument.'" Fin. Sec. Assur., Inc. v. Stephens, Inc., 500 F.3d 1276, 1285 (11th Cir. 2007) (quoting Reves, 494 U.S. at 66–67).

70

The Note in this case does not appear to belong in any of the categories articulated by the Second Circuit in Exchange Bank or Chemical Bank. The Court therefore proceeds with analyzing the four factors set forth in Reves to determine if a new category is necessary. According to the Supreme Court, "[f]irst, we examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" Reves, 494 U.S. at 66. Such is the case here. Defendant Lampley sought additional funding in order to fulfill payments for one of the fighter groups. (Am. Compl. Ex 76 (Docket Entry No. 96-4).) Plaintiff Barron provided the funds because he was told that it would help

build the fighter stable and that he would receive a ten percent return on the Note.  (Am. Compl. ¶¶ 531, 536.)

"Second, [the Court] examine[s] the 'plan of distribution' of the instrument, to determine whether it is an instrument in which there is 'common trading for speculation or investment.'"  Reves, 494 U.S. at 66 (quoting SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 353 (1943)).  This Note, offered only to Plaintiffs Barron and Nelson was not commonly traded as it was not offered to any segment of the public.

"Third, [the Court] examine[s] the reasonable expectations of the investing public."  Id.  The Supreme Court has "consistently identified the fundamental essence of a 'security' to be its character as an 'investment.'"  Id. at 68-69.  Here, the facts show that Plaintiff Barron viewed the loan

72

to Defendant Lampley and GSG as an investment in both the fighter group and the promised ten percent return.

"Finally, [the Court] examines whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." Id. at 67. Without the benefit of briefing by the Parties on these issues, the Court does not conduct an exhaustive review of other federal regulations that may govern the Note. The Note, however, was uncollateralized and uninsured, and did not relate to employment, making it likely that the Note would escape federal regulation if the Securities Acts did not apply. Moreover, Plaintiffs' primary contention is that the Note was a security. (Am. Compl. ¶¶ 541 ("The Note was a security."), 542 ("[Plaintiff] Barron's act of loaning [Defendant] Lampley

73

money to fund three new fighters in exchange for the Note constituted the purchase of a security.").)[21]

Based on the sum of the four factors discussed herein, the Court concludes that the Note was a security and that the federal securities laws do apply. Alternatively, the Court finds that the Note furthered the larger securities fraud scheme. In either case, Plaintiffs' RICO claims fall through the ropes because the PSLRA knocks them out.

### 3.  Summary

Based on the PSLRA and Federal Rule of Civil Procedure 9(b), the Court dismisses Counts 37, 38, 39, and 40 of the Amended Complaint.

---

[21] The Amended Complaint, however, does state: "In the alternative, the Note was not a security, and the act of lending money to [Defendant] Lampley in connection with the Note did not constitute the purchase of a security." (Am. Compl. ¶ 547.)

74

**D. State Law Claims and Supplemental Jurisdiction**

Having dismissed all of Plaintiffs' federal law claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims. Plaintiff Barron resides in the State of Tennessee, as do Defendants Lampley and Leatherman, and Defendants GSG, SPG, DJE, and LJFG are incorporated under the laws of the State of Tennessee. Thus, the Court does not possess jurisdiction under 28 U.S.C.A. § 1332 to adjudicate these claims, and Plaintiffs must assert their state law claims only under the Court's supplemental jurisdiction as provided in 28 U.S.C.A. § 1367(a).

Under 28 U.S.C.A. § 1367(c), a district court has discretion to decline to exercise further jurisdiction over pendent state law claims if the court has dismissed all claims

75

over which it had original jurisdiction. 28 U.S.C.A. § 1367(c); Pintano v. Miami-Dade Housing Agency, 501 F.3d 1241, 1242 (11th Cir. 2007); Parker v. Scrap Metal Processors, Inc., 468 F.3d 733, 743 (11th Cir. 2006). A court should consider factors such as "judicial economy, convenience, fairness, and comity" when determining whether to decline supplemental jurisdiction over state law claims after dismissing all of the claims over which the court has original jurisdiction. Parker, 468 F.3d at 745-46; Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1288 (11th Cir. 2002). The Eleventh Circuit encourages district courts to dismiss remaining state claims where the district courts have dismissed all of the pending federal claims prior to trial. Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004).

Here, the Court has dismissed all the claims over which the Court has original jurisdiction. Applying the standard set forth above, the Court exercises its discretion under § 1367(c) to decline further supplemental jurisdiction over Plaintiffs' state law claims. Because the Court has not reached the merits of those claims and dismisses the claims without prejudice, Plaintiffs may re-file the claims in state court within six months of the date of this Order.

Despite Plaintiffs' contentions the issue of supplemental jurisdiction is ripe. Federal courts routinely decline supplemental jurisdiction over state law claims at the same time the courts dismiss all federal law claims. No further action is necessary. Plaintiffs had an opportunity to weigh-in and brief supplemental jurisdiction but declined to do so despite Defendants repeatedly raising the issue. Moreover, any briefing by Plaintiffs is likely to be futile, as the legal

77

issues are relatively straightforward and the Court has broad discretion to decline supplemental jurisdiction. The Court therefore dismisses Plaintiffs' state law claims without prejudice and ends this bout.

### E.   Claims against John Does and Doe, Inc.

Plaintiffs state that they are also bringing this action against John Does 1-10 and Doe, Inc. 1-10. (Am. Compl. at 1.) Those unknown Defendants are included in many counts of the Amended Complaint. (See e.g., Am. Compl. ¶¶ 597, 885, 1030.) Generally, "[f]ictitious party practice is not permitted in federal court." Wessinger v. Bd. of Regents of Univ. Sys. of Ga., No. 1:06-CV-2626-WSD, 2007 WL 1430388, at *1 (N.D. Ga. May 14, 2007) (internal quotation marks and citations omitted). There is "a limited exception...when the plaintiff's description of a defendant is so specific as to be at the very worst, surplusage."

78

<u>Richardson v. Johnson</u>, 598 F.3d 734, 738 (11th Cir. 2010) (per curiam) (internal quotation marks and citations omitted). Here, Plaintiffs have not provided sufficient information to allow the Court to identify Defendants John Does 1-10 or John Doe, Inc. 1-10, and Plaintiffs therefore may not proceed against those fictitious Defendants.

Alternatively, the Court finds, based on the reasoning explained <u>supra</u> Part III.A-D, that the claims against Defendants John Does 1-10 and John Doe, Inc. 1-10 should be dismissed. The Court therefore dismisses those claims.

## IV. Plaintiffs' Second Motion to Produce

In light of this Court's Order dismissing Plaintiffs' claims against Defendants Leatherman, Justman, DJE, LJFG, and TMG, the Court denies Plaintiffs' Second Motion to Produce as moot. Plaintiffs may attempt to obtain those records if they decide to not throw in the towel and to pursue their

79

claims through state courts.  The records sought by Plaintiff do not appear to be relevant to adjudicating Plaintiffs' Motion for Default Judgment against Defendants Lampley, GSG, and SPG and are thus unnecessary for the action in this Court.

## V.   Conclusion

ACCORDINGLY, the Court **GRANTS** Defendant Leatherman's Motion to Dismiss [118], Defendant Justman's Motion to Dismiss [121], and Defendants DJE, LJFG, and TMG's Motion to Dismiss [125].  The Court **DISMISSES** all of Plaintiffs' federal law claims against Defendants Leatherman, Justman, DJE, LJFG, TMG, John Does 1-10, and Doe, Inc. 1-10, Counts 1, 2, 3, 4, 5, 6, 7, 13, 14, 15, 16, 17, 18, 19, 25, 26, 27, 28, 29, 30, 31, 37, 38, 39, and 40, **WITH PREJUDICE**.  The Court **DISMISSES** Plaintiffs' remaining state law claims against those Defendants **WITHOUT**

**PREJUDICE**.   The Court **DENIES** Plaintiffs' Second Motion

to Produce [146] **AS MOOT**.

IT IS SO ORDERED, this the 25 day of January, 2016.

_____
UNITED STATES DISTRICT JUDGE

81